## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEBRASKA

| | | |
|---|---|---|
| **DANIEL WILSON,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | **8:06CV761** |
| **v.** | ) | |
| | ) | |
| **UNITED STATES OF AMERICA,** | ) | **MEMORANDUM AND ORDER** |
| | ) | |
| **Defendant.** | ) | |
| | ) | |

This matter is before the magistrate judge pursuant to 28 U.S.C. § 636 and the consent of the parties.  A trial to the court was held on March 11-12, 2008.  The parties submitted post-trial briefs on May 2, 2008, at which time the matter was deemed submitted for decision. After careful consideration, the court finds that judgment should be entered in favor of the plaintiff.

## I.  INTRODUCTION

Plaintiff, Daniel Wilson, was injured in an automobile accident in Papillion, Nebraska on October 5, 2005 when his vehicle, a 1997 Nissan Sentra, collided with a United States Postal Service semi-truck driven by Robert Jones.  After the Postal Service denied Wilson's administrative claim, Wilson filed this action pursuant to the Federal Tort Claims Act alleging the defendant's driver, Robert L. Jones, negligently caused the collision.  Defendant denies Jones was negligent and affirmatively alleges that Wilson was contributorily negligent.

## II.  JURISDICTION AND VENUE

This court has subject matter jurisdiction pursuant to 28 U.S.C. § 1346(b).  Venue is proper in the District of Nebraska under 28 U.S.C. § 1402(b).

## III.  FINDINGS OF FACT

Plaintiff, Daniel Wilson (Wilson) is a resident of Omaha, Douglas County, Nebraska.

On or about July 30, 2006, Wilson filed an administrative claim with the United States Postal Service (USPS) for injuries he sustained in a motor vehicle accident involving a USPS vehicle.  On December 4, 2006, the USPS issued a notice of final denial of Wilson's administrative claim.

On Wednesday, October 5, 2005, at about 7:00 a.m., Wilson was driving his automobile south in the right-hand curb lane of southbound 84th Street (also known as Highway 85, or Washington Street) near the intersection of 84th Street and Cary Street in Sarpy County, Nebraska.  At the same location, a semi-tractor/trailer owned by the USPS and operated by one of its employees, Robert L. Jones (Jones) was also traveling southbound on 84th Street.  The USPS vehicle was traveling ahead of Wilson's vehicle in the left-hand lane.

A collision between Wilson's vehicle and the defendant's semi-tractor/trailer occurred near the intersection of 84th Street and Carey Street on Wednesday, October 5, 2005.  Wilson's vehicle collided with the semi when Jones attempted a right turn from the left-hand lane of southbound 84th Street onto westbound Cary Street.  It had been raining and was still

-2-

raining a little bit.  The roadways were wet and there was some standing water in low spots on the road.

At this location, 84th Street has two southbound lanes and  two northbound lanes separated by an island.  Carey Street is just over 37 feet wide, with one westbound lane, one eastbound lane, and a left-turn lane to access northbound 84th Street from the eastbound lane. The surface of 84th Street is asphalt/blacktop, and Cary Street on both sides of the intersection is concrete.  The U.S. Post Office is located on Cary Street to the west of 84th Street.

On a typical weekday, traffic is fairly heavy in that area between 7:00 and 8:00 a.m., due to the location of a housing development, numerous businesses, and Papillion - La Vista High School at or near the intersection.  The intersection is steadily busy throughout the day and becomes busier again during the evening rush hour.

Papillion Police Officer Raymond Higgins is a patrolman whose duties include motor vehicle accident investigation and accident reconstruction.  At about 7:20 a.m. on October 5, 2005, he and Officer Corey Habrock, driving separately, were dispatched to the scene of the accident at 84th and Carey Streets.  The vehicles had not been moved after coming to a final rest.  They first secured the scene by blocking traffic.  One vehicle was a United States postal semi with a single-axle cab and 50-foot double-axle trailer being driven by Jones.  The other was a red Nissan Sentra driven by Wilson.  No other vehicles were involved in the

-3-

accident.  Higgins did not recall either the truck's turn signals or hazard lights being on.  He did recall that its marker lights were on.

Officer Higgins took measurements and prepared diagrams of the scene.  Officer Habrock interviewed the drivers.

Officer Higgins made markings on the road showing the positions of the vehicles in case they were moved before actual measurements were taken.  The approximate point of impact was determined by examining the markings on the roadway, which was wet.  While there were no skid marks, possibly due to the rain, it was apparent that the red vehicle slid sideways after impact, leaving "squeegee marks" on the pavement.  The only physical evidence laying on the roadway was a hubcap or plastic cover from one of the tires.  Due to the rain and wet roadways, however, any other tire markings had disappeared.  No parts were removed from either vehicle for purposes of accident reconstruction.

The vehicles remained at the scene for 30 to  minutes. The Sentra was removed by tow truck.  It was damaged in the left front corner area and was underneath the trailer up to the top of the "windshield line," and both of its air bags were deployed. The USPS vehicle, which sustained minimal damage to a tire, was driven to the post office.

Officer Higgins prepared a diagram (Ex. 5), based on the measurements he took at the scene of the accident.  The diagram shows the resting place of the two vehicles and the point of impact, based on Officer Higgins' observations and measurements.  The red Sentra collided with the trailer just in front of the front axle on the right side of the trailer.  The

automobile became lodged under the trailer and was dragged sideways for approximately 12 feet as the truck turned the corner onto Cary Street.  The Sentra came to rest at a 90 degree angle with the trailer.

The 2005 Nebraska Driver's Manual provides that "a right-hand turn shall be made as close as practical to the right-hand side of the road or street."  (Ex. 113 at p. 44). According to Officer Higgins, given the length of the vehicle, it appeared unlikely that the USPS vehicle could make a right-hand turn from the right-hand lane without going over the curb and possibly striking the traffic light pole or a vehicle that might be present in the left-turn lane on Cary Street.  A semi should proceed slowly and gradually in making a sharp 90-degree right-hand turn such as this to avoid from tipping or rolling over.

The June 2006 Nebraska Manual for Commercial Driver's Licensing (Ex. 25 at p. 2-30) provides:

**Space for Turns**     The space around a truck or bus is important in turns.  Because of wide turning and offtracking, large vehicles can hit other vehicles or object during turns.

**Right Turns.**  Here are some rules to help prevent right-turn crashes:
* * * *
- If you are driving a truck or bus that cannot make the right turn without swinging into another lane, turn wide as you **complete** the turn....  Keep the rear of your vehicle close to the curb.  This will stop other drivers from passing you on the right.

- Don't turn wide to the left as you start the turn ....  A following driver may think you are turning left and try to pass you on the right.  You may crash into the other vehicle as you complete your turn.
* * * *

-5-

Based on his investigation, Officer Higgins could not tell where the Sentra was in relation to the USPS truck as the truck reached the intersection; however, he could tell they were both going south in the two southbound lanes. He could not determine the speed of the vehicles prior to impact.

Officer Habrock prepared a report (Ex. 118) of the property damage accident at 84th and Cary. Habrock parked his cruiser to deflect oncoming traffic and made contact with the drivers to make sure they were okay. He then asked them for their driver's licenses, registration and proof of insurance so he could complete the accident report. Habrock's report reflects that Wilson said he attempted to stop but skidded on the wet roadway and collided with the tractor-trailer. The State of Nebraska requires officers to report whether or how a driver contributed to the cause of the accident. In his report, Officer Habrock reported the contributing circumstance of an improper turn made by the driver of the semi-tractor. As to any contributing circumstance on the part of the plaintiff, Habrock reported, "unknown" as opposed to "no improper driving" because he could not determine whether Wilson's conduct had contributed to the accident. (236:3-237:24; Ex. 118; Ex. 27).

Wilson testified that he was familiar with the intersection of 84th and Cary because he traveled that road every day to work. On the day of the accident, Wilson was working a full time construction job with Underground Services. The company buried phone lines for Qwest and Cox Cable, built manhole covers, moved duct lines. Wilson's uncle was a part owner of the company.

-6-

Wilson generally worked five days a week, Monday through Friday, for eight hours a day, and worked overtime during the summer.  The ground was too wet to do construction work on October 5, 2005, so Wilson was given the day off and left the shop to do errands.  His automobile, the Nissan Sentra, was functioning normally.  The windshield wipers were working and his vision was not obstructed by dirty or broken windows.  It was lightly misting, as opposed to raining.

Wilson entered 84th Street at Giles Road, planning to go to Home Depot.  He was driving in the right-hand curb lane, as Home Depot was on that side of the road, and intended to go straight through the intersection at 84th and Cary.  There was no vehicle in front of him in the right lane.  Wilson was driving about 45 miles per hour, which is the posted speed limit.  He was paying attention to the roadway, was not using a cell phone, eating, drinking, or adjusting his radio.  He was wearing a seat belt.  The light was green.

Wilson first observed the semi when it was traveling ahead of him in the left-hand lane of 84th Street.  He never saw the semi traveling in the right-hand lane.  Wilson, driving 45 miles per hour, was gaining on the semi, which appeared to be slowing down.  He did not see any turn signal flashing on the semi and expected the semi to go straight ahead.  Wilson had a green light and intended to drive past the semi through the intersection.

As Wilson approached the intersection of 84th and Cary, the semi was completely in the left-hand lane; however, it suddenly made a right-hand turn in front of Wilson's vehicle.  Wilson slammed on the brakes, knowing that he could not go left or right due to the presence

of the semi trailer on the left and a light pole on the right. He applied the brakes twice, but the vehicle hydroplaned and went faster instead of slowing down. He realized he would be going under the trailer, so he ducked his head down in case the top of the car was torn off under the trailer. Wilson was not able to avoid the collision.

After feeling the impact, the next thing Wilson recalled was somebody at the side of the vehicle asking if he was okay. The air bags had deployed and the inside of the vehicle was filled with smoke. He could not get out through the driver's door because the car was pinned against a tire, so he climbed over the console and got out the right door.

Wilson walked over to the sidewalk, feeling somewhat disoriented. He then realized he could not lift his left arm. Wilson is left-handed and did not have any problems with his left arm or shoulder before the accident.

Wilson did not receive any medical treatment at the scene. His wife came to get him. She took him to their personal physician, Dr. Paul Vana, who X-rayed Wilson's shoulder. Dr. Vana prescribed pain medication, but the X-ray did not reveal any injury. Dr. Vana thought there could be an injury that only an MRI would show. He recommended that Wilson see an orthopedic surgeon, but to wait seven to 10 days for the swelling to go down.

Wilson felt fine overall, except he could not use his left arm. He could only raise the arm a couple feet away from his body and experienced pain in the shoulder blade area. He was not able to return to work after the accident and stayed home the next three or four days.

-8-

He had to stay sitting up, as the shoulder would hurt more if he tried to lay down. He slept in a recliner. His wife had to help him shower and get dressed.

On October 14th, 2005, Wilson was examined by Dr. Randall Neumann, an orthopedic surgeon. The shoulder was still painful and his range of motion was restricted. After reviewing an MRI of Wilson's shoulder, Dr. Neumann determined that Wilson had a large acute tear of the rotator cuff involving the supraspinatus (the main muscle of the rotator cuff) and part of the infraspinatus muscle. It was a moderate tear, about two inches, that was pulled completely off the bone by the muscle. The supraspinatus would not function unless it was repaired down to the bone. The lack of function would involve loss of strength and, possibly, range of motion. The loss of strength would impede the patient's ability to perform daily activities, especially anything above the shoulder level. The injury is also painful, from the time of onset through rehabilitation, "and even can give you some pain on and off after that." (Ex. 22, 13:20-22).

Because these injuries do not heal well with conservative treatment, Dr. Neumann recommended surgery, which was performed October 26, 2005. The surgery went well and was followed by a course of physical therapy.

After the surgery, Wilson went to physical therapy three times a week for approximately six weeks. He could drive to his therapy sessions. Each session lasted about 1½ hours. Wilson responded well to physical therapy, and his strength, level of pain, and range of motion all improved. After completing physical therapy in March 2006, Wilson still

experienced some pain in the left shoulder and limitations with activity.  He testified he still experienced some pain as of the date of trial and does not have a full range of motion.

Dr. Neumann testified that Wilson made good progress and was "very, very functional" when he completed physical therapy; however, he still had some functional deficits.  (Ex. 22, 15:17-21).  The doctor stated that he did not formally tell Wilson he had to quit doing construction work but did tell him on several occasions that people with rotator cuff injuries who return to construction work may continue to have problems.  Dr. Neumann recalled that Wilson did a lot of overhead work and told Wilson that things above the shoulder level would be difficult.  He generally tells patients with this type of injury to see if they can get into more of a management role in their construction work.  Ultimately, Wilson was not restricted from doing construction work because, after treatment, his rotator cuff was intact; however, "[if you] continue to abuse your shoulder when you've had those types of injuries, you can have more problems than you started off with."  (Ex. 22, 17:10-16).

According to Dr. Neumann, Wilson reached maximum medical improvement by June 21, 2006.  (Ex. 22, 19:1-8).  Dr. Neumann opined that (1) the conditions Wilson was experiencing at that time with his left shoulder and the limitations he had were permanent, and (2) Wilson had a 15 percent partial impairment rating of the left upper extremity, based on the American Medical Association guide to impairment ratings (Ex. 22, 19:21-21:13).  This rating accounts for Wilson's level of pain.  Dr. Neumann anticipated that Wilson would

continue to have discomfort in the shoulder, requiring anti-inflammatory medicines or physical therapy from time to time, but not a large amount of pain.

Wilson testified that, due to his shoulder injury, he can no longer perform the construction work he did before the accident.  He was earning $13.50 an hour, 40 hours per week, at Underground Services, which was partially owned by his uncle.  Plaintiff was laid off as part of a seasonal reduction in force in about November 2005 because his uncle knew he could not come back to do construction work after the accident.  Had he not been injured, Wilson would have continued his employment at Underground Services.

After the accident, Wilson missed approximately 34 weeks of work, amounting to lost wages of about $18,360.

During the year after the accident, Wilson could not participate in sports or outdoor activities with his children.  As time passed, he was able to resume these activities, at a reduced level.  He gained weight due to the eight months of inactivity.

Wilson began working as a table games dealer at Horseshoe Casino in June of 2006, making $4.65 an hour, plus tips.  To obtain this job, Wilson had to complete six weeks of unpaid training.  He works evenings, from 10 p.m. until 6 a.m., Saturday through Wednesday,  with Thursdays and Fridays off.  The hours on his construction job were from 6:30 a.m. to 3:30 p.m. Monday through Friday.  The new work schedule has changed his family life and reduced the amount of time he can spend with his sons.  According to Wilson,

his earnings at the casino are comparable to, and possibly more than, the wages he earned at Underground Services.

Wilson's medical expenses totaled $10,719 (Ex. 18).

Robert L. Jones testified that he was employed by the United States Postal Service as a semi driver on the day of the accident. Jones has driven tractor-trailers since 1965 and obtained a commercial driver's license when they became available in about 1985. In 2005, he was working about 40 hours per week for the Postal Service.

On October 5, 2005, Jones started work between 5:00 and 6:00 a.m. at the main post office at 13th and Pacific Streets in Omaha. He was assigned a route and a vehicle. The roads were wet, and it was raining "enough that if your wipers were on the slowest sweep that they would keep it off." (268:9-11). Jones drove with his wipers on. He went from the main post office to the Ralston post office near 72nd and Main Street and unloaded mail there. He then returned to 72nd Street, went south on 72nd to Giles Road, and went west on Giles to 84th heading for the Papillion post office. He was scheduled to arrive in Papillion by 7:30 a.m. and was on time.

Jones testified that he drove so that he would be stopped at a red light at 84th and Giles because he could then make a left-hand turn onto 84th Street, on a an green arrow light, knowing the location of all other vehicles. He was the first vehicle in the turning lane on Giles, with two vehicles behind him making the same turn. He noticed three or four vehicles

across the street waiting to make a right turn to head south on 84th. Wilson's red Nissan Sentra was the first car in that line.

On the green arrow, Jones turned left onto southbound 84th Street. He turned directly into the right-hand lane because, as he was picking up speed, the vehicles behind him would want to pass. The two vehicles that were behind him in the turning lane did pass him on 84th Street while he was driving in the right lane. No other vehicles passed him.

According to Jones, it is approximately a "long two blocks" from Giles Road down to Cary Street, where he was going to turn. About halfway between Giles Road and Cary Street, he typically moves over and straddles both lanes if there is no traffic close to him, and activates his turn signal. Just before he gets to Cary Street, he has to move over fully into the second lane to make the right-hand turn onto Cary.

In this instance, Jones straddled the two southbound lanes for about one and one-half truck lengths before fully moving into the left lane. He had reached a maximum speed of about 35 miles per hour on 84th Street and was down to about 20 miles an hour when he began moving to the left. He testified he had his right turn signal on prior to moving all the way left before making the right turn onto Cary. He had checked the turn signals at the main post office, and all of the lights were in working order.

As his semi straddled the roadway, Jones noticed several cars in the left-hand turn lane on Cary to go eastbound onto 84th. In his mirrors, he could see the cars that had started out from 84th and Giles. There was a car in the right-hand lane. Jones could not see whether

-13-

this vehicle had a turn signal; however, it would have to either turn at Cary or continue south on 84th Street. The presence of these vehicles would affect his decision about how to accomplish the right-hand turn.

As Jones began the turn, he relied on his mirrors. He testified that he continuously checked his mirrors and saw no vehicles present within three-quarters of a block. There were vehicles behind him in both lanes, but they were more than three-quarters of a block away. Jones estimated he was moving less than five miles an hour because of all the traffic. He stated he did not believe it was possible that anyone would have been able to run into him. Jones admitted he observed Wilson's vehicle, about three-quarters of a block back, when he initiated his turn. (264:1-4).

Jones became aware of the collision when he felt a bump; he thought he had run into a curb. He then looked out the side window and saw the vehicle underneath the trailer. He stopped the truck, put the flashers on, and called his dispatcher. Activating the flashers would override any turn signal light that may have been flashing because the flashers operate off of the same lights. Jones himself had no problems with any slick road surfaces before this accident occurred.

Since the car's air bags had deployed, Jones told the dispatcher to call an ambulance. Jones got out of the truck and went over to the car to make sure that the driver was all right. Since Wilson had just gotten out of the car and said that he was all right, Jones asked the dispatcher to cancel the ambulance and just send a police cruiser.

Jones agreed that his vehicle was completely in the left lane of 84th Street prior to his initiating the right turn. He insisted that he could not possibly make a right turn onto Cary Street from the right-hand lane of 84th Street because the street was too narrow and there was other traffic present. It might be possible if there was no other traffic; however, due to the length of the trailer, he would run into the curb. In Jones' opinion, he would never get a chance to make a clean right-hand turn from the right-hand lane of 84th Street at that time of day, as the eastbound and left turn lane on Cary would be full of traffic.

The parties presented conflicting evidence about statements made at the scene. Wilson testified that "the very first thing [Jones] said to me when he got out of the truck was I didn't see you." (156:17-18). Jones denies making that statement. Jones testified that Wilson told him "if it hadn't have been wet, he could have stopped." (263:13-14). Wilson denies making that statement.

## IV.  LAW

The issues reserved for trial at the final pretrial conference were:

- Whether defendant's driver, Robert L. Jones, was negligent in the operation of the semi tractor-trailer and caused the collision on October 5, 2005.

- Whether Wilson sustained personal injuries from the automobile collision and, if so, the nature and extent of the injuries.

- The amount, if any, of Wilson's damages from the collision.

- Whether Wilson was contributorily negligent in driving his vehicle too fast for the conditions.

- Whether Wilson was contributorily negligent in failing to maintain a proper lookout while driving his vehicle.

## A. Negligence

In a diversity action for negligence, the federal district court applies the law of the forum state, here, Nebraska. *See Heatherly v. Alexander*, 421 F.3d 638, 641 (8th Cir. 2005); *Jordan v. NUCOR Corp.*, 295 F.3d 828, 834 (8th Cir. 2002). "Ordinary negligence is defined as doing something that a reasonably careful person would not do under similar circumstances, or failing to do something that a reasonably careful person would do under similar circumstances." *Traphagan v. Mid-America Traffic Marking*, 251 Neb. 143, 152, 555 N.W.2d 778, 785 (1996).

Under Nebraska law, an action for negligence exists when a defendant owes a legal duty to a plaintiff, the defendant fails to discharge that duty, and damage results from the failure to perform the duty. *Jordan v. NUCOR*, 295 F.3d at 834. The party claiming negligence must prove each of these elements by a preponderance of the evidence.

### 1. Duty

Nebraska imposes a duty of reasonable care on all drivers. In cases such as this, Nebraska juries are instructed that "[d]rivers are negligent if they do something a reasonably careful driver in the same situation would not have done, or fail to do something a reasonably careful driver in the same situation would have done." NJI2d Civ. 7.03A (2007). The duty of reasonable care requires all drivers to take into consideration their own speed; the

-16-

condition of their vehicle; the condition of the road; the presence of other vehicles, pedestrians or objects; and any other factors that affect driving conditions.  *See id.*

### 2.    Breach of Duty

After carefully considering the testimony and credibility of the witnesses, the exhibits received in evidence, and the arguments of counsel, the court finds by a preponderance of the evidence that Mr. Jones acted negligently in making a right-hand turn from the left southbound lane of 84th Street.

Under the Nebraska Rules of the Road, "[b]oth the approach for a right turn and a right turn shall be made as close as practicable to the right-hand curb or edge of the roadway."  Neb. Rev. Stat. § 60-6,159(1); *see also* NJI2d Civ. 7.18 (2007).  The violation of a statute or safety regulation is evidence of negligence, and the weight of that evidence is considered by the trier of fact.  *See Raben v. Dittenber*, 230 Neb. 822, 826, 434 N.W.2d 11, 14 (1989).

Mr. Jones may have driven carefully, generally speaking, on the morning of October 5, 2005; however, the issue presented to the court is whether Mr. Jones met his duty of reasonable care, while driving a semi tractor with a 50-foot trailer, when he made a right-hand turn from the left lane of a busy street during the morning rush hour when there was a safer–but slower–alternative available.

The court realizes that it may be difficult, if not impossible, for the driver of a large truck to make a sharp right turn at this particular location.  If it is not "practicable" for a

-17-

driver to make the right turn from the right-hand lane, the driver may still make the turn but must wait until "such movement can be made with reasonable safety." *See* Neb. Rev. Stat. § 60,6,161. Mr. Jones declined to wait, and forged ahead knowing that plaintiff's car was behind him in the right-hand lane. He rejected the notion that he could safely turn onto Cary Street from the right-hand lane of 84th Street because it would take longer, there was too much traffic, and he did not want to delay other drivers by waiting for the eastbound traffic to clear Cary Street.

Mr. Jones was a commercial truck driver for may years before this accident occurred. He knew or should have known of tactics, such as those specified in the 2005 Nebraska Driver's Manual, that should be used in turning this type of vehicle so as to prevent or discourage other drivers from passing on the right.

Jones admitted he was completely in the left-hand lane of 84th Street when he started making the right turn. The activation of his right turn signal while he was in the left lane would not necessarily indicate to another driver that he intended to turn right onto Cary Street; other drivers could reasonably assume he intended to go straight ahead and change lanes after the right lane was clear. One could attribute the slowing speed of the semi in the left lane to mechanical difficulty or the driver's possible intention to turn left.

Finally, Mr. Jones had accounted for the presence of a number of vehicles at the time he began turning, and he was aware of Wilson's vehicle in the right lane. He testified it had not passed him and, from that location, it would have had to go straight south on 84th Street

-18-

or turn onto Cary Street.  There was no testimony that Jones ever applied his brakes to

accomplish a right-hand turn, only that his speed decreased as he drove down the left lane

of 84th Street.  Jones' testimony suggests that he assumed that the driver of the car in the

right-hand lane would know what Jones intended to do because Jones' vehicle was a big

truck.  Jones, relying on his mirrors, did not hesitate in executing the turn even though he had

not accounted for the whereabouts of Wilson's vehicle, which he admitted he knew was

somewhere in the right-hand lane.

The court finds that Jones breached his duty of care in that he failed to properly

consider the presence of other vehicles on the road when he executed the turn.

### 3.   Proximate Cause

Under Nebraska negligence law, proximate cause consists of three
elements: that (1) but for the negligence, the injury would not have occurred,
(2) the injury is the natural and probable result of the negligence, and (3) there
is no efficient intervening cause.  *Shelton v. Bd. of Regents of the Univ. of
Neb.,* 211 Neb. 820, 320 N.W.2d 748, 752 (1982). The *foreseeability* of an injury
that results from a negligent act determines whether that injury is the "natural and
probable result" of the act.  "To constitute proximate cause ... the injury must be the
natural and probable result of the negligence, and be of such a character as an
ordinarily prudent person *could have known,* or would or ought to have *foreseen*
might probably occur as the result."  *Steenbock v. Omaha Country Club,* 110
Neb. 794, 195 N.W. 117, 118 (1923) (emphasis added).  "The law does not require
precision in foreseeing the exact hazard or consequence which happens. It is
sufficient if what occurs is one of the kind of consequences which might reasonably
be foreseen."  *Brown v. Neb. Pub. Power Dist.,* 209 Neb. 61, 306 N.W.2d 167,
171 (1981) (quotation omitted).

*Heatherly v. Alexander*, 421 F.3d at 641-42.

Nebraska commercial drivers are instructed that the drivers of smaller and faster

vehicles are prone to passing semi-tractor/trailers on the right when the semi driver attempts

-19-

to execute a right-hand turn.  As discussed above, Mr. Jones negligently attempted the right-hand turn.  Had he not done so, the accident would not have occurred.  Wilson's injuries were the natural and probable result of Jones' negligence, and there was no efficient intervening cause of the accident.

### 4.   Damages

The court finds that Wilson was damaged as the result of Jones' negligence, sustaining a 15 percent partial impairment of the left upper extremity, lost wages, medical expenses, damage to his vehicle, and pain and suffering.

### B.   Contributory Negligence

Having found that Wilson has proven Jones' negligence by a preponderance of the evidence, the court turns to the Postal Service's arguments that Wilson was contributorily negligent.    To prove contributory negligence, the Postal Service must prove by a preponderance of the evidence that (1) Wilson was negligent in the ways claimed by the Postal Service, and (2) Wilson's negligence was a proximate cause of his damages.

> [P]laintiffs are contributorily negligent if (1) they fail to protect themselves from injury, (2) their conduct concurs and cooperates with the defendant's actionable negligence, and (3) their conduct contributes to their injuries as a proximate cause. *Baldwin v. City of Omaha*, 259 Neb. 1, 607 N.W.2d 841 (2000).  To entitle a defendant to judgment under the comparative negligence statutory scheme, the defendant must prove that any contributory negligence chargeable to the plaintiff is equal to or greater than the total negligence of all persons against whom recovery is sought. *Id. See* Neb. Rev. Stat. § 25-21,185.09 (Reissue 1995).

*Fickle v. State*, 273 Neb. 990, 735 N.W.2d 754, 1003 (2007).

-20-

The issues preserved for trial were whether Wilson was contributorily negligent in driving his vehicle too fast for the conditions and in failing to maintain a proper lookout while driving his vehicle.[1]

### 1.   Speed & Road Conditions

A plaintiff's alleged contributory negligence was addressed by the Nebraska Supreme Court in *Carroll v. Chase County*, 259 Neb. 780, 612 N.W.2d 231 (2000), in which the plaintiff was injured after his automobile came over a hill on a county gravel road and collided with a road maintainer. The road maintainer was backing up the hill, against traffic, in the plaintiff's lane of traffic. The equipment operator was looking forward at the time of the accident, not in the direction of traffic approaching in his lane of travel from over the hill. Although there was a warning sign which read "Road Construction 500 Feet" approximately 500 feet from the crest of the hill in the plaintiff's direction of travel, there were no other warnings or any other evidence of construction between the sign and the crest of the hill. The posted speed limit was 50 miles per hour and the plaintiff was traveling between 45 to 50 miles per hour when he crested the hill. The plaintiff immediately applied his brakes and skidded for 183 feet before running into the back of the maintainer. In affirming the trial court's judgment that the sole proximate cause of the accident was the county's negligence,

---

[1]At the time of the final pretrial conference, which governs the issues to be determined at trial, the Postal Service did not preserve any argument for contributory negligence based on Wilson's allegedly committing a traffic violation by attempting to pass the semi by proceeding through the intersection at a speed higher than that of the semi. *See* Neb. Rev. Stat. § 60-6,134. The argument is raised at page 11 of the Postal Service's post-trial brief. The alleged statutory violation does not appear to be relevant to the issues actually preserved for trial, i.e., driving too fast for the road conditions and failing to maintain a proper lookout. The court, therefore, will not consider this argument

the Nebraska Supreme Court found that the plaintiff was operating his automobile within the speed limit at a safe and appropriate speed, maintained a proper lookout, and conducted himself in a reasonable and prudent manner, notwithstanding the placement of a road construction warning sign. 259 Neb. at 785-86.

In the present case, Wilson's testimony that he was driving about 45 miles per hour when the semi suddenly turned into the right-hand lane is uncontroverted. The investigating officers could not determine the speed of either vehicle and could only determine an approximate point of impact on the road. Nor could they determine whether Wilson somehow contributed to the cause of the accident. They did determine that Mr. Jones' improper left-hand turn contributed to the cause of the accident.

The road was wet, and there was mist or light rain, but there is no evidence that any vehicle or driver perceived the road as being unduly slippery or had any problems with traveling, braking, or stopping in the normal course of driving.

The traffic light was green on 84th Street, the Postal Service vehicle was traveling completely in the left lane, and Wilson reasonably anticipated being able to drive straight through the intersection at the posted speed limit. Instead, he was confronted with the sudden and unexpected presence of the Postal Service semi when it turned from the left lane directly into his path. Even assuming that the semi was traveling only 5 miles per hour[2], it did not have to travel very far to block the right-hand lane. There is no evidence as to how

_____

[2]The absence of evidence that Jones ever applied his brakes before making the turn detracts from the credibility of Jones' testimony as to this point.

-22-

long it would have taken Wilson to stop if the road was dry.  The presence of "squeegee marks" on the road, with nothing more, does not establish that Wilson was driving too fast for the road conditions when he slammed on his brakes.  The Postal Service has not met its burden of proof on this issue.

### 2.   Keeping a Proper Lookout

Both drivers were familiar with the typical traffic conditions on this particular road. As discussed above, Wilson was aware of the Postal Service semi traveling in the left lane. He was aware that he was gaining on the semi and that the truck seemed to be slowing down. Under Nebraska law, a person may assume that every other person will use reasonable care and will obey the law until the contrary reasonably appears.  The court will assume, without deciding, that Mr. Jones used his right turn signal.  By the time the police officers reached the scene, the truck's emergency flashers were operating, precluding any determination by them as to whether the truck's right turn signal had been activated. The marker lights on the Postal Service vehicle were on.  There was no testimony that Jones ever applied his brakes to accomplish a right-hand turn, only that his speed decreased as he drove down the left lane of 84th Street.

The plaintiff testified, credibly, that he did not see the truck's right turn signal.  The positions of the two vehicles before the accident could not be determined by police officers with experience in accident reconstruction.  There is no evidence the plaintiff could have seen the truck's signal from the relevant position on the roadway given the relative sizes of

-23-

the vehicles. Wilson was paying attention to the roadway and was not talking on the phone, playing with the radio, eating, or drinking in the car. He was driving at a reasonable speed in the right-hand lane of traffic. The gist of the Postal Service's argument is that Jones was driving a large truck and could not quickly manipulate a right-hand turn from the right-hand lane; therefore, Wilson should have known (because the truck had slowed down) that Jones intended to cut in front of him in order to turn right onto Cary Street from the left lane of 84th Street.

The court finds that the Postal Service has not proven by a preponderance of the evidence that Wilson failed to keep a proper lookout.

### C. Amount of Damages

The court has determined that the October 5, 2005 accident was proximately caused by the defendant's negligence, that plaintiff suffered damages, and the plaintiff was not contributorily negligent.

The record shows that plaintiff incurred medical expenses of $10,719 and $18,360 in lost wages, based on the wages he was earning at Underground Services at the time of the accident. He was completely unable to return to work as a construction worker until June 21, 2006. Even then, he would have been ill-advised to do hard physical labor. Plaintiff completed the job training necessary to work as a table games dealer and has been successful in that endeavor; however, the work is sedentary and requires that he work inconvenient hours. His family life has been significantly disrupted. Although plaintiff's medical

treatment was successful, he did sustain a 15 percent partial impairment of the left upper extremity, which has limited his options for employment and recreation.  It is likely that the injury will cause at least some pain or discomfort for the rest of plaintiff's life.  The 2007 Period Life Table published by the Social Security Administration (Ex. 17) indicates that a person of plaintiff's age would be expected to live 33.28 years.  The "Commissioners 1980 Standard Ordinary Mortality Table" published in the Revised Statutes of Nebraska 2006 Cumulative Supplement., Vol. 4 (Appendix) at page 4348, which appears to be the most recent of three tables, indicates that a person of plaintiff's age would be expected to live 30.06 years.

The court finds that the plaintiff is entitled to recover damages for medical expenses, lost wages, and past and future pain and suffering.  Based on the evidence of record,  and considering the 15 percent partial impairment of plaintiff's left upper extremity, the court awards damages to the plaintiff in the total amount of $125,000.00.

### V. DECISION

Pursuant to this Memorandum and Order, judgment will be entered separately in favor of the plaintiff and against the defendant in the amount of $125,000.00.

**DATED June 10, 2008.**

**BY THE COURT:**

**s/ F.A. Gossett**
**United States Magistrate Judge**